AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Middle District of Pennsylvania

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 1:26-MC- 00080 |
| AN APPLE IPHONE 12, AS FURTHER DESCRIBED IN ATTACHMENT A | ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the      Middle      District of      Pennsylvania      , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1591(a) | Sex trafficking of children or by force, fraud, or coercion |
| 18 U.S.C. §§ 2251(a)/2252A(a) | Production, distribution, and possession of child pornography |
| 321 USC § 841 | Distribution/possession with intent to distribute controlled substances |

The application is based on these facts:

I, Alyssa Alliger, being first duly sworn, hereby depose and state as follows:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Alyssa Allger, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone *(specify reliable electronic means).*

Date:      02/02/2026

*Susan E. Schwab*
*Judge's signature*

City and state:   Harrisburg, PA

Susan E. Schwab, U.S. Magistrate Judge
*Printed name and title*

## CONTINUATION SHEETS IN SUPPORT OF
## SEARCH WARRANT APPLICATION

## INTRODUCTION AND AGENT BACKGROUND

1.     I provide the following in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic cellular telephone device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Capital Area Resident Agency office located in York, Pennsylvania. I have been employed as a Special Agent with the FBI since 2021.

3.     I am currently assigned to investigate crimes against children including child exploitation and child pornography offenses in violation of Title 18, United States Code, Sections 1951, 2251, 2252, 2252A and 2423. Additionally, I have been involved with investigations of violations of other federal statutes including fraud, violent crime, online sexual exploitation, and kidnapping. As a Special Agent, one of my primary

duties is the enforcement of federal laws and the security of government witnesses and entities identified during the course of these investigations. I have been trained in conducting criminal investigations using digital and electronic techniques.  I have had the opportunity to review numerous examples of digital evidence and have participated in the execution of many search warrants involving child exploitation offenses.

4.    These continuation sheets are intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.    The property to be searched is identified in Attachment A:

a.  Apple iPhone 12 in a silver Otterbox case; and

b.  Apple iPad Serial Number GG7W8808HLJJ

6.    The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7.    On April 28, 2025, Pennsylvania State Police ("PSP") conducted a lawful traffic stop of a black Ford Edge with an expired temporary Missouri registration plate 07N71S. The vehicle was traveling eastbound on the Pennsylvania Turnpike within the Middle District of Pennsylvania when PSP initiated the stop.

8.    The PSP trooper approached the vehicle and discovered Minor Victim 1 (MV1)[1] —a 17-year-old female—asleep in the front passenger seat of the vehicle. The owner of the car, Issys KEEGAN—a 19-year-old female—was seated in the rear driver-side seat. JEROME ANTHONY OLIVER—a 52-year-old male—was driving the vehicle. It was later revealed that MV1 had been entered into the National Crime Information Center as "missing and endangered."

9.    KEEGAN provided consent to search her vehicle and troopers discovered dozens of condoms, personal lubricant, lingerie, and several hotel key cards.

---

[1] Minor Victim's name and identity are known to law enforcement.  Minor Victim is referred to as "MV1" to protect the identity of the minor victim in this case.

10.     PSP Troopers interviewed MV1 on April 28, 2025, and again on May 2, 2025. During these interviews, MV1 made several relevant statements. She advised that she currently attends a high school in Kansas City, Missouri.

11.     According to MV1, she met OLIVER approximately six months previously in downtown Kansas City, Missouri. He offered for her to come inside his home, to smoke marijuana and that he would take care of her. She recalled they had sexual intercourse on that date.

12.     MV1 subsequently moved into OLIVER's residence and was watching OLIVER's children and helping him at his store in Kansas City. MV1 said it was just her, OLIVER, and his children living at his residence.

13.     MV1 said OLIVER gave her anything she wanted. MV1 stated OLVIER would provide her with alcohol, marijuana, and "pink pills" (oxycontin). MV1 would continue to engage in sexual activity with OLIVER on an almost daily basis. MV1 stated that she felt forced to engage in this sexual activity because of OLIVER would tell her she had to take care of her "daddy".

14.     OLIVER owns a store in Kansas City known as "Born Exotic" where MV1 worked and had modeled clothing for him. OLIVER stated in an interview that the store sells outfits such as lingerie, swimwear, and eyelashes for women. MV1 stated that the store has a Facebook and Instagram account where MV1 is posed in sexually explicit photos, wearing lingerie. Law enforcement confirmed the Facebook account exists but was unable to gain access to the photographs to confirm their existence. Law enforcement has observed the "Mega Personals" advertisements relating to Keegan and MV1 which do appear to contain photographs of MV1 and Keegan as described above.

15.     MV1 stated that OLIVER recorded her having sexual intercourse with him at the Kansas City apartment using an iPad. OLIVER also recorded her modeling outfits from his store at both Kansas City apartment and at the store. She stated that there were pictures taken where she was bent over, wearing no underwear.  MV1 believes these images and recordings would be stored on an iPad and/or computer in the bedroom at Kansas City apartment .  MV1 also believes that OLIVER has sexually explicit photos of her on his phone.

16.    Initially, MV1 was not forced to engage in prostitution or other commercial sexual activity while they were living in Kansas City. However, at some point OLIVER told her they were "going on vacation" which was when things "took a turn" according to MV1. OLIVER initially explained that MV1 would simply be dancing in a club; however, while they were travelling through St. Louis, Missouri, OLIVER made clear that MV1 would be required to prostitute herself.

17.    During this timeframe, KEEGAN worked with OLIVER as a prostitute and assisted OLIVER in coordinating prostitution activities.

18.    According to MV1, KEEGAN and OLIVER created a "Mega Personals" account advertising MV1 for prostitution activities. They utilized photos that had been taken of MV1 posed suggestively in lingerie.  MV1 indicated she was forced to manage the Mega Personals account and communicate with clients regarding sexual services. According to MV1, she had to tell the customers where she was located and what her rates were for commercial sexual activity. She advised a "quick visit" was $175, 30 minutes was $200, and an hour was $220. OLIVER and KEEGAN set the prices she was required to advertise.

19.    MV1 travelled across state lines with OLIVER and KEEGAN engaging in commercial sexual activity coordinated by OLIVER and KEEGAN.   They travelled from Kansas City, Missouri, to St. Louis, Missouri, then to Columbus, Ohio, and were on their way to New Jersey. MV1 described the "whole trip" as "basically him making money off us.

20.    OLIVER continued to engage in sexual activity with MV1 during the trip.   The most recent sexual activity was in Ohio, prior to being stopped by PSP.   Further, MV1 was fearful of OLIVER during this trip, MV1 described one occasion where OLIVER took her phone away from her.

21.    On April 28, 2025, OLIVER was arrested in Cumberland County, Pennsylvania during the course of the investigation.

22.    According to law enforcement records obtained from Homeland Security, a female witness (hereinafter "FW1") reached out to the arresting county's District Attorney's Office after news of OLIVER's arrest was made public. The witness's personal information is known to law enforcement but not provided here to protect her identity.   FW1 was interviewed by an HSI Special Agent and a PSP Trooper. FW1 advised she met OLIVER in 2022 and moved into OLIVER's apartment which

was located at 1103 Grand Boulevard, Apt 1102 Kansas City, Missouri. FW1 advised that the apartment was not leased in his name, but rather a woman identified as Victoria. She explained that while she lived at OLIVER's residence, maintenance workers would slide notices under the door which would be addressed to Victoria. Through databases available to law enforcement, your affiant was able to identify "Victoria" as Victoria Paige.

23.    FW1 advised, during the time she lived at OLIVER's residence, that there was a lot of sexual activity and controlled substance use. According to FW1, OLIVER obtained oxycodone through a doctor in New Jersey and would give them to women at his apartment. FW1 indicated that she also witnessed a drug sale of approximately one pill bottle of oxycodone to another individual in Wichita, Kansas.

24.    According to FW1, there were instances where she would wake after having used drugs or alcohol to find OLIVER having sex with her. She was also aware that he had recorded sexual acts. He would utilize pictures and videos of her to advertise on "Mega Personals." OLIVER would use his cell phone to record her but also had a laptop and two tablets. She was aware that OLIVER would transport his belongings

in a backpack, which would be stored in his bedroom at his residence or in his vehicle.

25.    FW1 advised that she had traveled to New Jersey in the past with OLIVER. She had been with him when he obtained the prescription medication, but the primary purpose of the travel was to sexually traffic her. She explained that they would travel through multiple states, stay in hotels, and solicit clients for sexual services through "Mega Personals" advertisements. The last trip FW1 went on was approximately six months before the interview with HSI.

26.    During the course of the investigation, FBI Agents made contact with Kendra Harty, the manager of the apartment building for OLIVER's residence. Harty informed law enforcement that an individual identified as "Asia" called asking to get into OLIVER's apartment because OLIVER had been in a "terrible accident". Harty did not allow Asia into the residence as she was not listed on the lease but was unsure if Asia got in through another occupant.

27.    On 06/10/2025, FBI agents executed a lawfully obtained search warrant for OLIVER's residence in Kansas City, Missouri. It was

determined that the electronic devices had been removed from the residence.

28.    SA Alliger made contact with Asia Autry following the search warrant. Autry advised she had gone into OLIVER's apartment and taken a tablet that belonged to OLIVER. She provided SA Alliger the Apple iPad that she took from OLIVER's residence.

29.    SA Alliger made contact with FW1. FW1 provided Agents a cell phone that was given to her by OLIVER to use.

30.    The evidence items collected from Autry and FW1 were collected and booked into evidence in Kansas City. The evidence items were shipped from FBI Kansas City to FBI Philadelphia where they have remained in secure storage in the evidence control room.

## DEVICE CONTENT

31.    Based on my training and experience, I know that persons involved in criminal activities may use cellular devices and other electronic devices to access social media, or other web-based applications. This includes utilizing cellular phones to exchange and access child pornography. In particular, persons involved in criminal activities may use private messaging functions of social media to communicate in

furtherance of criminal activities in an effort not to be detected by law enforcement.

32.    Based on my training and experience, I know that individuals may use phones to take photographs and videos of themselves and others. Those photographs and videos may show geographic locations, and oftentimes includes metadata showing the date, time and location the image was taken. Cell phones, as well as applications used on cell phones, may contain GPS location data. This information can be used to determine the location of a cell phone, and given the ubiquity of individuals carrying cell phones, is therefore probative of the location of the owner of the cell phone.

33.    The Device described in Attachment A is currently in the lawful possession of the Federal Bureau of Investigation (FBI). It came into the FBI's possession in the following way:

    a. Apple iPhone 12 in a silver Otterbox case was collected from FW1; and,

    b. Apple iPad Serial Number GG7W8808HLJJ was collected from Asia Autry.

Therefore, while the **FBI** might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that the FBI's examination of the Device will comply with the Fourth Amendment and other applicable laws.

34.    The Device is currently in storage at FBI Philadelphia Evidence Control Room. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the FBI.

## TECHNICAL TERMS

35.    Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone:    A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A

wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to

a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can

receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d. PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.

e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

36.    Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the Device has capabilities that allow it to serve as a computer, wireless telephone, digital camera, GPS, and to access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

37.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

38.    There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer/cell phone storage media—in particular, cell phone/computers' internal

hard drives—contain electronic evidence of how a computer/cell phone has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer/cell phone users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

39. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, when, and where.

There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Computer/cell phone file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer or cell phone is evidence may depend on other information stored on the device and the application of knowledge about how the device behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

40.    *Nature of examination.*    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

41.    *Manner of execution.*    Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

42.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

# ATTACHMENT A

## Property to Be Searched

1.     The property to be search is an iPhone 12 cellular device in a silver Otterbox case hereinafter the "Subject Device". CURRENTLY LOCATED AT **3501 Concord Road, York, PA 17402.**

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

# Items to be Seized

1.    All records and information on the Device described in Attachment A that are evidence, fruits of the crime, or contraband relating to violations of Title 18 U.S.C. §§ 1591(a)(1) (sex trafficking of minors or by force, fraud, or coercion, and conspiracy to commit the same under § 1594(c)); 2251(a) (production of visual depictions of the sexual exploitation of children) and 2252A (distribution and possession of child pornography); and 21 USC § 841 (distribution of controlled substnaces) ("SUBJECT VIOLATIONS") including:

    a.  All images and videos of child pornography.

    b.  All stored electronic and wire communications and information in memory on the target device including email, instant messaging, text messages, other communications, contact lists, images, videos, voice mail, and any other content or records on the device.

    c.  Video clips and photographs digitally stored within the target device's internal memory, SIM card, or other removable data

storage device, which constitute evidence of the listed offense, and/or will help agents to identify other persons who are involved in the SUBJECT VIOLATIONS;

d. Ledgers, receipts, invoices, and other documentary evidence that is stored electronically in the target device's internal memory, SIM card, or other removable data storage device which constitute evidence of the SUBJECT VIOLATIONS, or which will help agents to identify other persons who are involved in the SUBJECT VIOLATIONS;

e. Evidence of user attribution showing who used or owned the target device at the time the things described in this warrant were accessed, viewed, created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

f. Evidence indicating how and when the Device was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation.

As used above, the terms "communications," "records," and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored on the device listed in Attachment A, including any form of electronic storage (such as SIM card or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities of the SUBJECT VIOLATIONS described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.